

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 04 CR 0705 |
| ) | |
| AARON PATTERSON and ) | Judge Rebecca R. Pallmeyer |
| MARK MANNIE ) | |
| ) | |
| In the matter of ) | |
| Attorney Demitrus Evans ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Aaron Patterson was convicted on all thirteen counts of the indictment against him, in which Patterson and a co-Defendant, Mark Mannie, were charged with narcotics trafficking and weapons offenses. The trial, which began on June 30 and continued until the afternoon of July 29, when the jury returned its verdict, was marked by disruption, emotional outbursts, and costly delays. Attorney Demitrus Evans represented Defendant Patterson in the pre-trial phases of this case and withdrew after jury selection. Because the court believes Ms. Evans herself was responsible for some of the delay; because she openly expressed disregard for the court's order that she turn over her files to substitute counsel; and because she publicly disparaged the conscientious efforts of Patterson's attorneys in a way designed to destroy the client's confidence in them; the court orders that Ms. Evans appear and show cause why she should not be held in contempt.

## BACKGROUND

Attorney Tommy Brewer represented Mr. Patterson together with Ms. Evans until February of this year, when he withdrew from the case, citing professional differences. Ms. Evans remained counsel of record. She sought and obtained a continuance of the initial February 2005 trial date and, when a second trial date approached, successfully moved the court to appoint additional counsel for

Mr. Patterson. The court granted that motion and appointed Attorney Paul Camarena, who was the Federal Defender Panel duty attorney on the Panel was notified of the court's order. Ms. Evans asked for a further continuance of the May 31 trial date, which the court granted with considerable reluctance.

The matter was re-set to begin on June 30. Ms. Evans appeared for numerous pretrial proceedings, several of which were interrupted or abruptly terminated due to Mr. Patterson's unruly behavior and verbal outbursts. On the eve of trial, the court having concluded that Mr. Patterson was competent to stand trial, Patterson asked the court to allow him to represent himself, a request the court denied. Mr. Patterson angrily denounced his lawyers, announced they no longer represented him, and shouted out his lawyers' home or office addresses in open court in an apparent effort to encourage his supporters, seated in the courtroom, to harass his lawyers at their homes. Ms. Evans and Mr. Camarena requested leave to withdraw as Mr. Patterson's attorneys. The court denied the request; the court believes Mr. Patterson's conduct was a manipulative effort to obtain a further trial delay, and was concerned that discharging these lawyers and postponing the trial date would only encourage such manipulation.[1]

---

[1] The court's conclusion regarding Mr. Patterson's competence, and its suspicion concerning Mr. Patterson's motives, were confirmed soon afterwards by the content of a recorded conversation between Mr. Patterson and an unidentified woman. In that conversation, Mr. Patterson referred to an incident that took place during the jury selection process, in which one of Mr. Patterson's supporters shouted at potential jurors. Mr. Patterson believed this incident was the reason that several jurors were discharged; he gratefully characterized this supporter's misconduct as having "bought me some time."

As the record shows, Mr. Patterson has engaged in continued misconduct, erupting in outbursts, profanity, and physical displays every time he was in the courtroom. Based upon the court's own observations and statements by security officers, the court is convinced that Mr. Patterson's conduct was calculated to delay or derail the proceedings. In support of this conclusion,
(continued...)

On the morning of June 30, Mr. Patterson refused to change into civilian clothing and declined to be brought over from the MCC for jury selection. The court was reluctant to accept a hearsay statement that Mr. Patterson was unwilling to appear for the process of jury selection and therefore directed that he be brought over by force. Soon after he arrived, Patterson engaged in another noisy outburst in which he announced his plan to incite "civil disobedience" at the home of his lawyers, urging his followers in the courtroom to surround those locations with pickets and chains. At this point, both attorneys again moved for leave to withdraw. By this time, more than 70 jurors had completed questionnaires. The court excused them for the day, directing half of them to return at 9:30 on Friday, July 1, and the remaining group to return at 12:30 that afternoon.

The following morning, Mr. Patterson came to court voluntarily, and the first group of some 30 potential jurors reported to the courtroom for jury selection. As the court began the process of interviewing these prospective jurors, Mr. Camarena called for a sidebar and reported that Mr. Patterson was leaning on his papers in a menacing way and interfering with his ability to proceed. The court excused the jurors and attempted to question Mr. Patterson about his conduct. Mr. Patterson flew into a rage, shouting at his lawyers. The court directed that he be removed, and Mr. Patterson resisted the efforts of three law enforcement officers; threw himself on a courtroom table,

---

¹(...continued)
the court notes reports from several security officers that Mr. Patterson is able to control his behavior immediately once he is away from an audience. Further, he expressed surprise at the court's determination to go forward with the trial even after his disruptive episodes. On Monday, July 25, Mr. Patterson became enraged with his attorneys and threw himself to the floor, injuring Mr. Brewer in the process, before the court was able to hurry the jury from the courtroom. While being transported from the Dirksen Building to the MCC that afternoon, Mr. Patterson expressed shock that the court had nevertheless continued to hear evidence and announced, "Next time I'll have to hurt someone."

3

fracturing it; fell to the floor, cursing and screaming; and demanded that the court and his own attorneys "get the f— off my case!" The court refused to permit him to return to the courtroom absent some commitment that he would remain peaceful, but invited him to participate in the proceedings by way of videoconference equipment that would enable him to see and hear the courtroom proceedings from the MCC. Mr. Patterson declined that invitation and, on each occasion since that date on which he has appeared in court, there has been some disturbance.

As Mr. Patterson was being removed on the morning of July 1, Ms. Evans herself became visibly upset, threw her papers to the table and exited the courtroom, in tears, shouting that she was off the case and would not return. Court staff and Mr. Camarena made repeated telephone calls to Ms. Evans, none of which were returned. The court ultimately signed a warrant for Ms. Evans's arrest. She did not reappear until 3:30 in the afternoon, accompanied by counsel who apologized on her behalf and represented that she would meet her responsibilities to her client and the court when the trial resumed the following Tuesday. Because the morning group of 30+ jurors had heard the courtroom commotion, the court excused them from further service. The remaining jurors, who were not aware of these events, were directed to return the following Tuesday, July 5.

Jury selection took three more days. By Friday, July 8, 18 jurors had survived cause and peremptory challenges. All 18 appeared for trial and the court was prepared to hear opening statements. Before the jurors were called in, Ms. Evans presented two motions, one relating to surveillance tapes the government expected to introduce and a second relating to a summary chart the government proposed to use during its opening. In the motion relating to surveillance tapes, Ms. Evans asserted that the court had refused to listen to the surveillance tapes, an assertion that Ms. Evans knew to be false. To the contrary, at Ms. Evans's request, the court had only that previous

4

afternoon spent hours listening to tapes that Ms. Evans herself had furnished. When the court overruled Ms. Evans's objections to the tapes and the chart, she again lost her temper and stormed out of the courtroom for a second time, angrily accusing the court of requiring her alone to "follow the rules." The court was again required to excuse the jurors for the remainder of the day.

Ms. Evans's departure left 18 jurors waiting, jeopardized a long-scheduled trial, and threatened the Speedy Trial rights of Patterson's co-Defendant, Mark Mannie. At this difficult juncture, Attorney Tommy Brewer stepped forward and advised the court that, with a few additional days, he could be ready to step back into the case and accept appointment as Mr. Patterson's lead counsel. The court concluded that Mr. Patterson's objections to his attorneys were naked efforts to delay the trial in this case, and that his in-court behavior precluded any confidence that the court might, consistent with fairness to the proceedings and to the rights of his co-Defendant, permit Mr. Patterson to represent himself. As noted, Mr. Brewer represented Mr. Patterson for several months after the return of the indictment, having withdrawn in February. He had access early on to the discovery materials and, despite his withdrawal, had attended many of the pre-trial proceedings in this case. Mr. Brewer has substantial criminal law experience as a former state prosecutor, a former federal agent, and a criminal defense attorney. He has tried more than 50 murder cases to verdict. He has a long relationship with Mr. Patterson that continued even after his formal withdrawal from this case earlier this year. Finally, as noted, he was prepared to proceed in this trial with only a very brief continuance.

The court directed Mr. Brewer and Mr. Camarena to attempt to meet with Mr. Patterson and return to the court room after a one-hour recess. Ultimately, the court appointed Mr. Brewer as lead counsel, and continued the trial to Tuesday, July 12.

Hours after her departure, Ms. Evans returned to the courtroom and without any mention of her own behavior, conveyed Mr. Patterson's demands that he be permitted to return to court; he would behave appropriately, she advised, on the condition that the court permit him to represent himself.[2] Only after prompting from the court did Ms. Evans apologize for her conduct in inexcusably delaying proceedings for a second time, explaining that the case is a "very emotional" one for her. At a chambers conference on Monday, July 11, 2005, Ms. Evans advised the court that there was "nothing personal" about her conduct and suggested that the court itself was at fault for her tearful departures. Most significantly, Ms. Evans appeared to adhere to the belief that the court's adverse rulings justified her conduct.

By her impulsive departures from the courtroom, Ms. Evans abandoned her responsibility to her client and to the court. She jeopardized the progress of a trial the court had already continued twice at her behest. She caused the loss of several hours of juror services and abused the time of the court, the prosecutors, her co-counsel, and the attorney for the co-Defendant. She has suggested that her own behavior is akin to the court's being forced by Mr. Patterson's conduct abruptly to adjourn pre-trial proceedings on two occasions, a suggestion that bears no discussion.

In addition to the concerns raised by Ms. Evans's unjustified departures, the court is troubled by indications that, after the termination of her representation of Mr. Patterson, she engaged in activity designed to delay or disrupt Mr. Patterson's representation here by substitute counsel. The court had ordered Ms. Evans to deliver all of the government's discovery production to her

---

[2] The court declined to negotiate with Mr. Patterson and repeatedly observed that he would be permitted to return only on an unconditional promise that he would comport himself with standards of courtroom behavior.

6

replacement attorneys. On Monday, July 25, 2005, Paul Camarena advised the court that Ms. Evans had not yet done so. He reported, further, that when he reminded her of her court-ordered obligations in a July 22 conversation, Ms. Evans responded by saying she "didn't care" about the court's order. The court is gravely concerned, in addition, that Ms. Evans has falsely accused Mr. Camarena and Mr. Brewer of conspiring with the government against Mr. Patterson's interests. She publicly accused Mr. Camarena of "throwing the case," an accusation that likely reached Mr. Patterson himself, either directly from Ms. Evans (MCC records show she continued to visit her former client on a regular basis) or from his supporters who heard these baseless statements. She went so far as to accuse Tommy Brewer of being the "case agent" for the FBI in this prosecution, a statement that borders on delusional. The court believes her statements concerning Mr. Brewer and Mr. Camarena to be slanderous. Her suggestion that those statements find support in the fact that Mr. Brewer and Mr. Camarena had little time to prepare for the defense is offensive. Any neutral observer of this trial would readily conclude that Mr. Brewer's and Mr. Camarena's preparation and effectiveness were overwhelmingly superior to that of Ms. Evans herself. More significantly, her baseless statements appear to have been designed to undermine any relationship of trust between Mr. Patterson and his trial counsel. To their credit, Mr. Camarena's and Mr. Brewer's performance was outstanding and their dedication unflagging. Their conduct does not excuse Ms. Evans' behavior, however.

Under 18 U.S.C. § 401, this court has the power "to punish by fine or imprisonment, at its discretion," contempt of authority in the form of: (1) misbehavior of any person in its presence; (2) misbehavior of any officers in their official transactions; or (3) disobedience or resistance to a lawful writ, process, order, rule, decree, or command. 18 U.S.C. § 401. The contempt power may be

exercised in either the civil or criminal context. *United States v. Dowell*, 257 F.3d 694, 697 (7th Cir. 2001), citing *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1000 (8th Cir. 1970). "The fundamental distinction between criminal and civil contempts is the type of process due for their imposition." *Dowell*, 257 F.3d at 699; *Doe v. Maywood Hous. Auth.*, 71 F.3d 1294, 1296-97 (7th Cir. 1995). Criminal penalties may not be imposed without affording persons the Constitutional protections afforded to a criminal defendant. *Dowell*, 257 F.3d at 699, citing *Doe*, 71 F.3d at 1297. Moreover, unlike criminal contempt, civil contempt requires only clear and convincing evidence. *Dowell*, 257 F.3d at 699, citing *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989).

As explained above, the court believes that Ms. Evans's conduct was contemptuous. Sanctions for civil contempt can be either coercive or remedial; they can be designed either to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained due to the contemptuous behavior. *Dowell*, 257 F.3d at 699, citing *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999). In *Dowell*, for example, the Seventh Circuit upheld a civil contempt citation ordering an attorney to reimburse the United States government for the costs of juror service and mileage on a day in which the attorney failed to appear and for the salaries, costs, and expenses of preparing for a trial that was postponed due to the attorney's failure to appear. *Dowell*, 257 F.3d at 699; *see also In re Jaques*, 761 F.2d 302, 306 (6th Cir. 1985) (attorney who failed to appear was properly sanctioned by civil contempt fine directing him to reimburse government for venire costs); *United States v. Claros*, 17 F.3d 1041, 1046-47 n. 4 (7th Cir. 1994) (court may order attorney to pay jury costs as sanction for negligent failure to appear). In light of the lengthy delays and inconvenience caused by Ms. Evans's two unexcused departures from the courtroom, the court believes that she must, at a minimum, reimburse the government for the costs of these delays.

Indeed, Ms. Evans's conduct arguably renders her vulnerable to criminal contempt sanctions. In *United States v. Herrera-Rivera*, 25 F.3d 491 (7th Cir. 1994), the trial court had continued a criminal trial to comport with the schedule of a defense attorney, to the inconvenience of the court, the government, and attorneys representing seven co-defendants. When the attorney failed to appear or move for a continuance on the scheduled trial date, the court issued a bench warrant for his arrest. *Id.* at 494. After being apprehended in Miami (where his practice was based) and brought to Chicago, the attorney explained that he was ready to proceed to trial, but that he had assumed that the trial would not begin until later in the week, due to another trial scheduled to begin on the same day. The court nevertheless held the attorney in criminal contempt, sentencing him to 15 days in the custody of the Attorney General and ordering him to reimburse the court for the cost of the jury venire. *Id.* at 495. The Seventh Circuit affirmed these sanctions. *Id.* at 494-95. Ms. Evans's behavior is as egregious as that of the attorney in *Herrera-Rivera*. On two separate occasions, Ms. Evans abruptly departed the courtroom. In both instances she was absent from the courtroom for a number of hours, only returning after having been ordered to do so by the court. On neither occasion did Ms. Evans express contrition for the inconvenience she caused to the court, the government, the attorneys, or, most importantly, the jurors. Significantly, Ms. Evans expressed her belief that her conduct was justified by what she perceives as the court's unfair rulings. An attorney's disagreement with the court is the basis for an appeal, not for a contemptuous disregard of her responsibilities.

For all of these reasons, the court believes civil contempt sanctions are appropriate. Thus, the court hereby directs Ms. Evans to appear on Monday, August 15, 2005, at 3:00 p.m. to

show cause why she ought not be held in contempt of this court for failure to abide by the court's lawful orders; and (a) fined to reimburse the United States Government for the cost of the service of 30 jurors on July 1 and 18 jurors on July 8; and (b) fined to reimburse the Federal Defender Program for the in-court compensation to be paid pursuant to the Civil Justice Act to Thomas Leinenweber, the attorney for co-Defendant Mark Mannie, on July 1 and July 8.

A copy of this order will be submitted to the Federal Defender Program.

ENTER:

Dated: August 5, 2005

REBECCA R. PALLMEYER
United States District Judge