**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 04 CR 705-1** |
| | ) | |
| **AARON PATTERSON,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

On July 29, 2005, a jury found Defendant Aaron Patterson guilty on all counts of a thirteen-count indictment in which he and co-Defendant Mark Mannie were charged with conspiracy to distribute heroin and marijuana, possession with intent to distribute heroin and marijuana, and illegal possession of a firearm. Defendant timely filed a *pro se* motion for judgment of acquittal and for a new trial; his attorneys subsequently filed on his behalf a second timely motion for a new trial. On March 27, 2006, the court denied both motions. Nearly a year later, on February 26, 2007, Defendant's new attorney filed a "Motion to Reconsider Denial of Motion for New Trial" (the "February 26 motion" or "Mot."), arguing that Defendant's rights to counsel and to due process were violated because he was denied his choice of trial counsel and, separately, his right of self-representation; and because trial counsel was unprepared and had a conflict of interest. The motion further contends that his trial was tainted by juror bias and prejudice. For the reasons explained below, the court concludes that Defendant's arguments are untimely and/or without merit. The motion is denied.

**A.      Defendant's Representation**

Beginning with his initial court appearance shortly after his arrest on August 5, 2004, Defendant was represented by attorney Demitrus Evans.  Attorney Tommy Brewer also appeared on Defendant's behalf at all preliminary proceedings, but did not file an appearance (42) until December 30, 2004.  Mr. Brewer orally moved to withdraw as Defendant's attorney on January 18, 2005, *see* Order of 1/18/05; his subsequent written motion (53) cited "a serious and substantial breakdown in communications" with Defendant.  According to Mr. Brewer, it was "apparent" that Defendant "had lost all confidence" in Mr. Brewer's representation, "as exhibited by" Defendant's refusal to meet with Mr. Brewer at the Metropolitan Correctional Center ("MCC").  The court granted Mr. Brewer's motion on January 27, 2005.[2]  Order of 1/27/05.

Beginning on February 11, 2005, the court granted the first of numerous motions for continuance of the trial date, which the court had initially set for February 22, 2005.  *See* Order of 2/11/05; Order of 10/19/04.  On April 12, 2005, Ms. Evans, citing "case complexity," requested appointment of additional counsel (98), which request the court granted on April 25.  Order of 4/25/05.  The court appointed attorney Paul Camarena on May 11.  Order of 5/11/05.  On May 18, 2005, Ms. Evans, claiming that she was not prepared to try the case, again moved to continue (120) the new trial date of May 31, 2005, and reiterated this request in a motion (135) filed on May 26,

---

[1]      As explained in greater detail in the court's previous rulings in this matter, Defendant's trial and related proceedings were marked by disruption, emotional outbursts, and costly delays, due both to Defendant's behavior and that of one of his attorneys, Demitrus Evans. The background the court presents here contains only the facts and elements of procedural history that are relevant to the pending motion.

[2]      In one of several unsupported factual assertions, the February 26 motion variously alleges that Defendant "discharged" Mr. Brewer, (Mot., at 2), "asked him" to withdraw, (*id.* at 25), and "fired" him.  (*Id.* at 26, 35, 40.)  None of these assertions are accompanied by any citation to the record, and the court is aware of no evidence that contradicts Mr. Brewer's explanation that he withdrew not at Defendant's request, but due to Defendant's refusal to meet with him at the MCC.

2005, along with an alternative motion for leave to withdraw. On May 27, the court reluctantly granted the new requests for continuance and reset the trial date to June 30, 2005. Order of 5/27/2005. The day before trial, Defendant filed a motion for leave to act as "co-counsel" (184); the court denied the motion the same day. Order of 6/29/05.

On the day trial was set to begin, June 30, 2005, Ms. Evans filed yet another motion for continuance (186), again citing inadequate trial preparation. Defendant also moved on that day to proceed *pro se*, and upon being informed that the court would accept filings only through counsel, demanded that both attorneys withdraw. *See* Memorandum Opinion and Order of July 22, 2005 (the "July 22 Order"), at 1-2. During an angry outburst, Defendant loudly announced the home address of each attorney, and urged his supporters in the crowded courtroom to engage in protests outside his attorneys' homes. *Id.* at 2. Counsel subsequently renewed their request for leave to withdraw. *Id.*

On July 1, 2005, the court denied counsel's motion to withdraw, Defendant's motions to proceed *pro se* or as "co-counsel," and the June 30 motion for a continuance. *See* Memorandum Opinion and Order of 7/1/05 (the "July 1 Order"), at 10. With respect to Defendant's request to represent himself, the court explained that he had forfeited his right to self-representation due to his "persistent refusal to obey even the most basic standards of courtroom decency." *Id.* at 8. The court also cited the need to protect jurors from the kind of threats Defendant had already made against his attorneys, and the danger of prejudice to co-defendant Mannie. In addition, the court noted that it had already granted two requests for continuance, pushing back the trial date from February to the end of May and then from May to the end of June. *Id.* at 9. The court further noted that Defendant appeared "determined to do everything within his power to delay his trial." *Id.* at 4.

On the morning of July 1, as described in greater detail in the July 22 Order, Defendant engaged in a violent outburst and was removed from the courtroom. During the fracas, Ms. Evans became distraught and left the courtroom for several hours, prompting the court to issue a bench

3

warrant for her arrest. July 22 Order, at 3. She returned to court that afternoon, accompanied by counsel who apologized on her behalf to the court and represented that Ms. Evans would meet her obligations to the court and to her client when trial resumed the following week. *Id.* at 3-4.

On July 8, after three days of jury selection,[3] Ms. Evans lost her temper following an adverse evidentiary ruling by the court and again stormed out of the courtroom. *Id.* at 4. The court then met in chambers with Mr. Camarena, the attorneys for the government and for co-defendant Mannie, and with Tommy Brewer.[4] Mr. Brewer advised the court that with three or four days preparation, he would be willing to step back into the case and accept appointment as Defendant's lead counsel. Tr. at 867-69. Although Mr. Camarena objected, voicing concerns that he himself might be ineffective as lead counsel, the court stated that it would likely overrule the objection if Mr. Brewer would indeed serve as lead counsel. Tr. at 873-74. The court directed Mr. Brewer and Mr. Camarena to attempt to meet with Defendant, Tr. at 874; ultimately, the court appointed Mr. Brewer as lead counsel, and scheduled opening arguments for July 12. *See* Order of 7/11/05.

On Monday, July 11, 2005, Mr. Brewer asked the court to delay the trial until Thursday, July 14, to give him additional time to familiarize himself with the evidence and with the court's prior rulings. Tr. at 908-11. Neither Mr. Brewer nor Mr. Camarena specifically moved for a continuance, however, nor was any such motion filed. The court, citing the potential impact of further delay on the continuing availability of the jurors, declined Mr. Brewer's request and maintained July 12 as

---

[3]     Defendant was not present in court on July 8, the court having concluded that he had waived his presence in the courtroom as a result of his disruptive behavior. The court arranged for Defendant to observe proceedings from the MCC via video conference, *see* Order of 7/5/05, and communicated with Defendant concerning that arrangement daily throughout the trial. Defendant has not, in any post-trial motion, challenged the court's decisions in this regard.

[4]     The February 26 motion asserts, citing nothing, that Mr. Brewer approached the government's attorneys to offer his services. (Mot., at 11.) Absent any evidence to support this assertion, the court disregards it. The court notes, moreover, that Assistant United States Attorney Niewoehner, the lead prosecutor, stated in chambers that he "ha[d] not spoken with Mr. Brewer." Tr. at 871.

the date for opening arguments, Tr. at 910-11; the court did, however, delay presentation of evidence until July 13, "in deference to Mr. Brewer and his very recent . . . reinvolvement in the case." Tr. at 928. On July 13, the court granted Ms. Evans' oral motion to withdraw, Order of 7/13/05, and on July 28, acting on concerns that she was interfering with trial counsel's representation of Defendant, barred Ms. Evans from visiting or communicating with Defendant. Order of 7/28/05; *see* Memorandum Opinion and Order of August 5, 2005, at 6-7.

On July 15, Defendant filed a "Notice of Appeal" (250) from the court's decision to appoint Mr. Brewer. The court construed this as an objection to Mr. Brewer's appointment, which the court overruled.[5] July 22 Order, at 1. The court noted that Mr. Brewer had represented Defendant for several months following his indictment, that he had early access to discovery materials, and had, even after withdrawing in January 2005, continued to attend many of the pre-trial proceedings in the case. *Id.* at 2. The court further observed that Mr. Brewer had substantial criminal law experience as a former prosecutor, a federal agent, and as a criminal defense attorney who had tried more than 50 murder cases to verdict. *Id.* The court also noted Mr. Brewer's long relationship with Mr. Patterson that had continued even after his withdrawal, and remarked on the fact that Mr. Brewer had been prepared to proceed with the trial after only a brief continuance. *Id.* Finally, the court observed that Mr. Brewer appeared well-prepared, capable, and effective at trial, and was capably assisted by Mr. Camarena, who had been on the case for over two months. *Id.* at 7.

## B.  Defendant's Alleged Attempt to Hire Private Counsel

In the February 26 motion, Defendant asserts that at some (unidentified) point between July 1 and Ms. Evans' second unwise departure from the courtroom on July 8, Defendant "hired private counsel" Scott Kamin. (Mot., at 9.) The record contains no competent evidence to support

---

[5]     Noting that a criminal defendant generally may not appeal until after sentencing, the Seventh Circuit dismissed Defendant's "appeal" for lack of jurisdiction. *United States v. Patterson*, No. 05-3078, slip op. at 1 (7th Cir. Sept. 14, 2005) (JJ. Bauer, Manion, and Evans).

the assertion that Defendant actually hired Mr. Kamin, however. Mr. Kamin did file an appearance (230) on July 7, 2005, as well as a motion for leave to substitute as counsel (231) that also requested a 60-day continuance. The court denied the motion as untimely. Order of 7/8/05. In his motion, Mr. Kamin represented that Defendant had, on four occasions between December 20, 2004 and January 13, 2005, "either directly or indirectly, expressed interest in retaining Mr. Kamin and his associate, and then met with them." (Motion for Leave to Substitute as Counsel (231) ¶ 3.) Mr. Kamin further stated that at some point after July 5, 2005, Defendant had, "through a third party, . . . indicated his interest in retaining Mr. Kamin and his associates." (*Id.* ¶¶ 5-6.) Presenting the motion in court on July 7, Mr. Kamin confirmed that Defendant had "indicated his interest through a third party," but identified that party only as "someone at the MCC."[6] Tr. at 773.

The February 26 motion now contends, however, that Defendant had in fact "hired" Mr. Kamin in July 2005. (Mot., at 9.) Defendant attaches Mr. Kamin's affidavit, which states that before he moved to substitute as counsel, he and Defendant "signed a contract according to which [Kamin] agreed to represent [Defendant] if the Court allowed [Kamin] to file an appearance in the case." (Kamin Aff. ¶¶ 3-4, Ex. 5 to Reply.) Attached to this affidavit is the first page of a "Contract for Legal Services and Fee Agreement" that purports to reflect that Aaron Patterson had retained Mr. Kamin and attorney Jason Epstein. The document is neither signed nor dated, nor has Defendant provided any remaining pages. Such an incomplete and unauthenticated document does not even minimally serve as competent evidence to support Mr. Kamin's statement in the affidavit; moreover, that statement itself is inconsistent with Mr. Kamin's representations to this court both in his motion for leave to substitute as counsel and in open court.[7]

---

[6]     Defendant was not in court on July 7, 2005, having waived his right to be present as noted above. He further declined to observe proceedings on that day via video conference from the MCC. Tr. at 727-29.

[7]     As noted *infra*, the court allowed Mr. Kamin to file an appearance on Defendant's
(continued...)

## C.    Alleged Juror Bias

On July 18, 2005, Assistant United States Attorney Hamilton advised the court that based on "fifth-hand" information, there had been "some communication" from one juror to a court security officer ("CSO") to the effect that the juror had "noticed the unsavory people in the gallery or words to that effect." Tr. at 1656. A CSO identified that juror as Juror 119. Tr. at 1661. The court and defense counsel then questioned Juror 119, who reported that "some of the people" observing the trial had been "kind of staring us down, and it was kind of intimidating." *Id.* The court asked the juror whether this affected his ability to be fair, and to listen to testimony and make a decision based on the evidence; Juror 119 replied, "Absolutely not." Tr. at 1661-62. When asked if other jurors shared these concerns, Juror 119 responded that he "[did not] think there [was] a problem." Tr. 1662-63. Both Mr. Brewer and Mr. Camarena questioned Juror 119 briefly as well; neither voiced an objection, and both indicated that they were "satisfied." Tr. at 1664.

On July 21, Juror 85 advised the court in chambers of her concerns over "people who come in and out" of the gallery. Tr. at 2042. She specifically mentioned "people who come in who are black and who are male and who are young and who are dressed in a manner that I would consider as someone that could possibly belong to a gang." Tr. at 2043. Juror 85 also reported that she had observed Defendant exchanging what she took to be gang signals with "these young men" in the gallery, and told the court: "I don't want to be on this jury. I don't want people coming to my home in the middle of the night to kill me." *Id.* She explained "this is the way I feel," but that other jurors had also expressed concerns about spectators starting at them. Tr. at 2043-44. When asked by Mr. Brewer if she sensed that other jurors "feel the same way you do," Juror 85 responded, "I do,

---

[7](...continued)
behalf in October 2005, well after the verdict, for purposes of filing a post-trial motion. Order of 10/28/05. It would not be unreasonable to conclude that the retention contract attached to Mr. Kamin's affidavit may have been executed at that time; this might explain why the remaining pages, presumably indicating a date other than July 2005, are missing.

yes," but that the jurors "tri[ed] not to say that much about it." Tr. at 2044.

In response to Juror 85's comments, the court, along with the attorneys for the defendants and the government, questioned each juror individually in chambers. Most (ten) reported that they had not noticed the people coming and going in the courtroom, and/or that the spectators had not bothered or distracted them. Tr. at 2078, 2080, 2082, 2084, 2085, 2087, 2090, 2094, 2104, 2110. One juror reported that members of the jury had expressed concerns over spectators "making signs . . . back and forth to the defendant," Tr. at 2067-68; another mentioned "weird looks" from spectators, Tr. at 2072; a third remarked that two men in sunglasses had "kind of like freaked me out a little bit," Tr. at 2088; and a fourth reported "discomforting . . . facial reactions" and possible gang signs from spectators, Tr. at 2096-98. All advised the court that this would not affect their ability to be fair to the defendants, or to fairly consider the evidence. Tr. at 2068, 2075, 2089, 2098-99. Juror 120 reported that a "bald, black" man in the galley had made her "a little bit nervous," Tr. at 2106, and that another man who had "made some signs" had made her "a little uneasy," Tr. at 2107, but that none of this had caused any distraction, Tr. at 2108. Other than Juror 120's passing reference, none of the questioned jurors mentioned the spectators' race.

Upon Defendants' motion and without objection from the government, the court excused Juror 85. Tr. at 2093, 2111. The parties made no motion with respect to any other juror.[8]

### D. Post-Trial Motions

On July 29, 2005, the jury found Defendant guilty on all thirteen counts charged in the indictment. On that date, the court directed that any post-trial motions be filed by August 29, 2005. Three motions for post-conviction relief were filed prior to the instant motion: first, Defendant on

---

[8] Later in the trial, following a violent outburst by Defendant, the court again questioned each juror individually to ascertain their ability to remain fair in light of his disruptive conduct. Tr. at 2550-2600. After Juror 131 responded equivocally, Tr. at 2586-89, the court, upon Mr. Camarena's motion and with no objection from the government, excused Juror 131. Tr. at 2589, 2598.

August 5 filed a *pro se* motion (the "August 5 motion") for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and for a new trial pursuant to Rule 33; second, on August 29, Mr. Camarena on Defendant's behalf moved for reconsideration of the court's finding of competency and for a new trial (the "August 29 motion"); and third, on December 5, 2005, Mr. Kamin and Mr. Epstein, for whom the court had in October 2005 granted leave to file an appearance, filed an "amended" motion for judgment of acquittal and for a new trial (the "December 5 motion"). Because the February 26 motion contends that the arguments raised therein were included in these prior motions, in particular in the August 5 motion, the court here presents the arguments contained in each, to the extent they are relevant to disposition of the pending motion.

### 1. The August 5 Motion

Defendant's *pro se* motion raised the following eight arguments: (1) Defendant should have been allowed to represent himself; (2) the court "forced [Ms. Evans] to be ineffective" by "requiring her alone to follow the rules," while not asking the same of the government's attorneys; (3) the court erred in reappointing Mr. Brewer because, according to Defendant, Mr. Brewer had "attempted to extort money from [him]"; (4) the court erred in appointing Mr. Camarena because he had allegedly conspired with the government's attorneys to obtain Defendant's conviction; (5) Mr. Brewer was unprepared for trial and thus ineffective; (6) the court should have granted a mistrial over Juror 119's reference to "unsavory" persons in the galley, or at least should have removed Juror 119; (7) the court "attempt[ed] to stymie the defense" when on July 25, 2005, the court ordered that Defendant's visitation and communication privileges at the MCC be limited to contacts with Mr. Brewer and Mr. Camarena; and (8) the court erred by allegedly allowing the government to redact and alter audiotape evidence.

On August 8, 2005, Defendant filed a *pro se* motion (318) for an extension of time to file an amended Rule 29 and Rule 33 motion. Having already extended that time period on the day the verdict was rendered, the court denied the motion. Order of 8/22/05; *see United States v. Hocking*,

841 F.2d 735, 737 (7th Cir. 1988) (citing Fᴇᴅ R. Cʀɪᴍ P. 29, 33, & 45) (district court, having initially granted extension of time for filing motions for acquittal or for new trial beyond the seven-day limit proscribed by the Rules, lacked authority to grant, outside the seven-day period, a successive request for an extension).   The court also explained: "In any event, Mr. Patterson is represented by counsel who intend to file post-trial motions on his behalf. The court declines to entertain his *pro se* motions."  Order of 8/22/05.

### 2.      The August 29 Motion

Shortly before his trial, the court had found Defendant competent to stand trial.  *See* Order of 6/29/05.  The August 29 motion, filed by Mr. Camarena, contended that Defendant's distrust of and refusal to cooperate with his attorneys at trial called that conclusion into question, requiring a new trial.  (August 29 motion, at 4-5.)

### 3.      The December 5 Motion

The December 5 motion, filed by Mr. Kamin, purported to be an "amended" motion for a new trial and for judgment of acquittal.   The motion contained the following eight arguments: (1) the court erred by reappointing Mr. Brewer because he had previously withdrawn due to a breakdown in communications, and because the court did not give him enough time to prepare for trial; (2) the court erred by barring Defendant's "public authority" defense; (3) the court should have allowed Defendant's attorney to accompany him to an interview with a government psychologist; (4) the court should not have excluded certain evidence proffered by Defendant regarding his mental health; (5) the court erred in denying Defendant's motion to bar audiotape evidence; (6) the court should have allowed Defendant to represent himself; (7) the court erred by not allowing Mr. Kamin to represent Defendant at trial; and (8) the court "erred in denying the [unspecified] evidentiary objections made by Defendant and in granting the [unspecified] evidentiary objections made by the Government."  (December 5 motion ¶¶ 1-8.)

### 4.      The Court's Denial of the Motions

On December 22, the court directed the government to respond only to arguments (1), (5), and (6) in the December 5 motion; the remaining five arguments, not having been raised to any extent in the timely August 5 and August 22 motions, were time-barred.  *See* Order of 12/22/05. On March 27, 2006, the court denied the August 5 and the August 29 motions.[9]  The court explained that Defendant had failed to show any "structural error" arising either from Mr. Brewer's preparation for trial, or from Mr. Camarena's lack of trial experience.  Order of 3/27/2006.  Rather, Defendant was required to make a showing of prejudice, which Mr. Kamin conceded in oral argument had not been made.  The court explained, in its Order and in court at a March 27 hearing, that to demonstrate prejudice due to ineffectiveness of counsel, Defendant was required, at a minimum, to point to some specific acts or omissions on the part of trial counsel, such as steps that counsel should have been taken, questions that counsel failed to ask, or evidence that counsel should have presented to the jury but did not.

## E.    The February 26 Motion to Reconsider

Defendant presently awaits sentencing.  On February 26, 2007—nearly nineteen months after the verdict, and nearly a year after the court denied Defendant's post-trial motions—Defendant's new attorney[10] filed a self-styled "Motion to Reconsider Denial of Motion for a New Trial."  The 82-page February 26 motion presents eleven grounds[11] for relief, some of which

---

[9]    Defendant wrongly asserts that the court "has never addressed the timely-filed *pro se* post-trial motion."  (Reply, at 7.)  In fact, the court's March 27, 2006 Order explicitly denied that motion in its entirety, and the court, as noted above, further explained its reasoning with respect to the claims Defendant had most vigorously advanced.

[10]    Mr. Kamin and his associates moved to withdraw (397) on May 30, 2006, explaining that Defendant no longer desired their representation.  The court granted the motion with respect to Mr. Kamin and his law firm on June 15.  Order of 6/15/06.  Mr. Epstein continued to represent Defendant until September 7, 2006, when the court granted Andrea Gambino leave to substitute as counsel.  Order of 9/7/06.

[11]    Because the court finds that the arguments presented in the February 26 motion are confusingly ordered and to a large degree rambling and repetitive, the court has attempted to glean
(continued...)

are entirely new, some of which were explicitly raised in the August 5 *pro se* motion, and some of which may have been raised in a general sense in that earlier motion, but are elaborated upon with new factual allegations. First, Defendant contends that the court erred in denying Ms. Evans' request for a continuance on the eve of trial, as well as Mr. Kamin's request for a 60-day continuance when he sought leave to substitute as counsel. (Mot., at 34.) Second, Defendant maintains that the court erred in appointing Mr. Brewer as lead counsel, because Mr. Brewer "previously had been fired" and thus did not represent Defendant's "best interests." (*Id.* at 35-38.) Defendant adds that the court should have further inquired as to why Defendant had "fired" Mr. Brewer in January 2004. (*Id.* at 39-40.) Third, Defendant argues that Mr. Brewer presented opinions to the court, regarding Defendant's "state of mind and strategy," that were "clearly at odds" with Defendant's interests. (*Id.* at 40-41.) Fourth, Defendant contends that the court "forced" Mr. Brewer to be ineffective by allowing him to enter the case only days before the trial, resulting in insufficient time for Mr. Brewer to investigate the defense and to adequately prepare. (*Id.* at 42-44.) Fifth, Defendant points to what he labels Mr. Brewer's "undisclosed conflict of interest," specifically, Mr. Brewer's participation in the State's Attorney's investigation into allegations of torture by Jon Burge and Chicago police officers, which investigation had reviewed Patterson's 1986 allegations of torture among those of other alleged victims.[12] (*Id.* at 44-45; Report of the Special State's

---

[11](...continued)
distinct grounds for relief, and has renumbered Defendant's arguments accordingly.

[12]     The February 26 motion does not describe the extent of Mr. Brewer's involvement in the investigation. The court notes that the introduction to the State's Attorney's report, expressing gratitude to those who participated, remarks that the investigators "[f]or a short period of time [] also had the services of . . . Tommy Brewer," who, like nine other attorneys mentioned, had "served on a part-time basis." (Burge Report, at 5.) In a letter attached to the government's response, Mr. Brewer informs the court that he was one of five Assistant Special Prosecutors appointed to assist Special Prosecutor Edward Egan, and that he had not conducted any investigation into Patterson's allegations of torture. (Letter from Brewer to the court of March 14, 2007, Ex. B to Resp.)
        For background on the Burge investigation and criticism thereof, see Michael Higgins, *New*
(continued...)

Attorney ("Burge Report"), Ex. D to Mot.) Sixth, Defendant argues that under the Supreme Court's recent holding in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006), this court violated Defendant's right to counsel of choice by denying Mr. Kamin leave to file an appearance on July 7, 2005. (Mot., at 46-48.) Seventh, Defendant maintains that the court erred in denying his request to proceed *pro se*, and faults the court for not having conducted a colloquy with Defendant to determine whether he was competent to represent himself. (*Id.* at 51-54.) Eighth, Defendant contends that the court's "forcing unwanted counsel" on him led to his being unprepared for cross-examination, which in turn caused his refusal to answer questions on cross-examination; this resulted in his testimony being stricken and, according to Defendant, left him unable to present his theories of entrapment, government misconduct, and lack of *mens rea*. (*Id.* at 57-62.) As an apparent corollary to this argument, Defendant argues that the court erred in barring him from presenting evidence of entrapment or selective prosecution prior to his testimony. (*Id.* at 64-66.) Ninth, Defendant maintains that the jurors were unfairly influenced by fear, based on racial prejudice, of spectators in the galley. (*Id.* at 67-78.) Tenth, Defendant contends that the court erred in allowing evidence of Defendant's alleged gang affiliation. (*Id.* at 79-81.) Finally, as his eleventh argument, Defendant insists that the "cumulative effect" of the above errors resulted in violation of his due process right to a fair trial. (*Id.* at 81-82.)

In the alternative, Defendant maintains that a number of "factual disputes" require a hearing. (Reply, at 4.) According to Defendant, the court should further inquire into (1) Mr. Brewer's alleged "volunteer[ing] his services to the government" in seeking reappointment; (2) Mr. Brewer's alleged conflict of interest due to his involvement in the Burge investigation; (3) the impact of Defendant's alleged post-traumatic stress disorder on his courtroom behavior; (4) whether Defendant in fact hired Mr. Kamin in July 2005; (5) whether any lawyer could have adequately prepared for trial with

---

[12](...continued)
*Report Blasts Probe Into Cop Torture*, CHI. TRIB., April 25, 2007, § 2, at 1.

the time afforded Mr. Brewer; and (6) "what was or was not done" by trial counsel in terms of preparation for trial and discharge of their responsibilities to Defendant.  (*Id.* at 5-7.)

**DISCUSSION**

**I.     Timeliness**

As an initial matter, the court must determine whether it may entertain any of Defendant's arguments.  The government contends that because the February 26 motion raises different arguments from those in any of Defendant's previous post-trial motions, it effectively amounts to a new Rule 33 motion; and because it was filed long after the time period for filing such motions ended, Defendant's arguments are untimely.  (Resp., at 2-3.)  Defendant expressly denies filing a Rule 33 motion, and instead characterizes the February 26 motion as a motion to reconsider the court's denial of Defendant's *pro se* August 5 post-trial motion.  (Reply, at 1-2.)  Defendant asserts, without citation to any authority, that such a motion to reconsider is not subject to the timeliness requirements of Rules 29 and 33, (*id.*), and that the court is permitted to address the merits of the motion so long as it maintains jurisdiction over the case.  (*Id.* at 3-4.)

The government is correct that to the extent the February 26 motion contains new arguments that were not raised in Defendant's timely post-trial Rule 29 and Rule 33 motions, the motion is, with the possible exception of Defendant's *Gonzalez-Lopez* argument, time-barred.  A motion for judgment of acquittal under Rule 29 may be made within seven days after the jury is discharged, *see* FED. R. CRIM. P. 29(c)(1), and Rule 33 similarly provides that a motion for a new trial, grounded on any reason other than newly discovered evidence, must be filed within seven days after the verdict or finding of guilty, *see* FED. R. CRIM P. 33(b)(2).  A court may, before expiration of the seven-day period, extend the time period.  FED. R. CRIM. P. 45(b)(1).  Although these time limits are not jurisdictional, they constitute "inflexible claim processing rule[s]" that mandate denial of an untimely petition as long as the government does not waive or forfeit the timeliness objection.  *Eberhart v. United States*, 546 U.S. 12, ___, 126 S. Ct. 403, 403, 407 (2005);

14

*see, e.g., Carlisle v. United States*, 517 U.S. 417, 421 (1996) (district court lacked authority to entertain Rule 29 motion filed eight days after jury was discharged); *United States v. Ogle*, 425 F.3d 471, 476 (7th Cir. 2005) (district court properly denied Rule 33 motion filed after seven-day time limit, and where "new evidence" exception did not apply).

In *United States v. Holt*, 170 F.3d 698, 702-03 (7th Cir. 1999), the Seventh Circuit held that an untimely post-trial motion that raises additional arguments not contained in previous, timely motions, cannot "relate back" to the previous motions. A defendant is thus not permitted to raise additional arguments in an untimely motion by characterizing that motion as a "supplemental" or "amended" pleading. *Id.* at 703. The court explained that allowing a defendant to raise a new argument beyond the end of Rule 33's time limit "would defeat the express language of the rule, and would create a back door through which defendants could raise additional grounds for a new trial long after the 7-day period had expired." *Id.* In this court's view, the same reasoning bars the court from entertaining new arguments in the guise of a "motion to reconsider" as well.

The jury in this case returned a guilty verdict on July 29, 2005. The court extended the time period for filing post-trial motions until August 29, 2005. The government does not dispute that Defendant's August 5 *pro se* motion and his attorneys' August 29 Rule 33 motion were timely. The February 26 motion, however, was filed nearly eighteen months later. Accordingly, with the possible exception of Defendant's *Gonzalez-Lopez* argument, which is based on intervening case law, any argument raised in the February 26 Motion that was not raised in either the August 5 motion or the August 29 motion is untimely and must be dismissed.

Defendant, however, contends that save for his *Gonzalez-Lopez* argument, all of the arguments in the February 26 motion were indeed included in the August 5 *pro se* motion, and have merely been more "fully articulate[d]" here. (Reply, at 1.) This necessitates a comparison between the claims in the instant motion and the August 5 motion, a task the court undertakes below. As a preliminary matter, however, it is unclear—even if the instant motion in fact reiterates earlier

arguments—whether the court has the authority to entertain a "motion to reconsider" that has been filed nearly a year after the court's decision denying Defendant's Rule 29 and 33 motions.

The Seventh Circuit has flatly stated that "[t]here is no authority in the Federal Rules of Criminal Procedure for a 'motion for reconsideration.'" *United States v. Griffin*, 84 F.3d 820, 826 n.4 (7th Cir. 1996). Although the parties in *Griffin* had not raised the issue on appeal, the court was "at a loss to understand any basis under federal law" for such a motion. *Id.* The court explained that aside from the relief afforded under the Rules, the only other appropriate avenue for post-conviction relief is provided by the federal habeas statute, 28 U.S.C. § 2255. *Id.* The court did note that the Supreme Court's decision in *United States v. Dieter*, 429 U.S. 6, 8-9 & n.3 (1976) may have implied that motions to reconsider are viable "by way of tradition despite the lack of any provision for them in the statutes or rules." *Id.* In *Dieter*, however, the Court held only that a timely petition for rehearing with respect to the court's grant of a motion to suppress can render a judgment nonfinal and thus toll the limitations period for filing a notice of appeal, despite the lack of an explicit provision in the Rules authorizing such tolling, 429 U.S. at 8 & n.3; the court did not address the propriety of such a motion in the context of Rules 29 or 33, nor what constitutes a "timely" motion. Similarly, in *United States v. Ibarra*, 502 U.S. 1, 6 (1991), the Court, citing *Dieter*, reiterated that a timely petition for rehearing renders a judgment nonfinal for purposes of appeal. *Ibarra*, like *Dieter*, involved a motion to suppress; and although the court did not address whether the motion for reconsideration was timely, it was filed within the 30-day period for appealing the ruling. *Id.* at 2-3.

Defendant cites *Ibarra*, but fails to explain why a motion for reconsideration that is filed nearly a year after denial of a Rule 29 or 33 motion should be considered "timely." Indeed, Defendant asserts that his motion "is timely and must be addressed," (Reply, at 8), but provides no explanation as to why this is so, and cites only one other case, an unpublished opinion from the Eleventh Circuit that provides little support for this assertion. In *United States v. Arrate-Rodriguez*, 160 F. App'x 829 (11th Cir. 2005), the defendant filed a motion for reconsideration of the district

16

court's denial of his motion for reduction of sentence. The appellate court noted the rule set forth in *Dieter*, but held that rule inapplicable, and the motion for reconsideration untimely, because the motion was filed *after* the time period for taking an appeal from the court's ruling denying the motion for reduction of sentence had expired and the court no longer had jurisdiction over the case. *Id.* at 832.

Other, published case law from the Eleventh Circuit is directly on point and squarely refutes Defendant's position. In *United States v. Gupta*, 363 F.3d 1169 (11th Cir. 2004), the defendants filed Rule 29 and 33 motions within the three-week time period set by the district court; the court denied the motions several weeks later. *Id.* at 1171-72. One year later, but before defendants had been sentenced, the defendants moved for reconsideration of that decision. *Id.* at 1172. Nearly two years after that, the court granted the Rule 29 and 33 motions. *Id.* Reversing, the Eleventh Circuit held that it was "abundantly clear that motions to reconsider or renew Rule 29 or 33 motions are not permissible if they are filed outside the seven-day post-verdict period or outside an extension granted during that seven-day period." *Id.* at 1176. "To permit the unlimited renewal or reconsideration of fully decided motions," the court reasoned, "would needlessly tie up judicial resources and seriously delay the final disposition of cases. Doing so would undermine both the language and purpose of the Rules." *Id.* at 1174.

As noted above, the Seventh Circuit has expressed reservations as to whether a motion for reconsideration of a Rule 29 or Rule 33 ruling can be entertained at all. *See Griffin*, 84 F.3d at 826 n.4. Our Court of Appeals has not specifically addressed the further issue of whether such a motion is "timely" if filed nearly a year after the ruling itself, but before entry of judgment. The court notes that other circuits have dealt with this issue in varying ways. The Eleventh Circuit, as discussed above, would find Defendant's motion untimely under *Gupta* because it was not filed within the original time period set by this court for filing post-trial motions. 363 F.3d at 1176; *see also United States v. Harrison*, No. CRIM. A. 03-430, 2006 WL 287857, at *7 (E.D. Pa. Feb. 7, 2006) (following

*Gupta* in denying as untimely a motion to reconsider a Rule 29 ruling that was filed more than a year after the ruling, but before sentencing). In the Second Circuit, district courts will entertain a motion for reconsideration in a criminal case if such a motion is filed within ten days of the court's determination of the original motion, in accordance with a local rule in the Southern and Eastern Districts of New York. *See United States v. Yannotti*, 457 F. Supp. 2d 385, 389-90 & n.17 (S.D.N.Y. 2006) (finding untimely a motion for reconsideration filed three months after the court's ruling on a Rule 29 motion, but before sentencing). The Sixth Circuit similarly follows a rule that a petition for reconsideration of a Rule 29 or Rule 33 ruling must be filed within ten days after the ruling. *See United States v. Stull*, Nos. 87-3874 to 87-3876 & 87-3889, 1988 WL 41148, at *1 (6th Cir. May 3, 1988) (unpublished opinion). Defendant's motion would be untimely under this standard as well, as it was filed eleven months after this court's denial, on March 27, 2006, of Defendant's Rule 29 and 33 motions.

Courts in other circuits have suggested that a motion to reconsider a Rule 33 ruling is allowed within ten days of the entry of judgment, i.e., during the time allotted for filing a notice of appeal from the judgment, rather than from the date of the ruling itself. *See United States v. Miller*, 869 F.2d 1418, 1420-21 (10th Cir. 1989) (motion for reconsideration of Rule 33 ruling "timely if filed within ten days of the entry of the judgment or order"); *United States v. Cook*, 670 F.2d 46, 48 (5th Cir. 1982) (motion timely "within ten days of the entry of judgment"); *but see United States v. Ramirez*, 954 F.2d 1035, 1038 (5th Cir. 1992) (motion to reconsider ruling denial of Rule 33 motion untimely because it was filed "more than ten days after the court had denied [defendant's] new trial motion"). Under the approach suggested by *Miller* and *Cook*, Defendant's motion might be timely, as Defendant has not yet been sentenced, judgment has not yet been entered, and the time for appealing from the judgment has thus not yet expired.

Defendant cites none of the above cases, fails to advance any cogent argument as to why its present motion should be considered timely, and cites to no authority other than *Ibarra* and

*Arrate-Rodriguez*, neither of which, as explained above, address the relevant issue.  The Eleventh Circuit's decision in *Gupta* is directly on point, and its result appears to be most consistent with the skepticism expressed by the Seventh Circuit in *Griffin* with regard to motions for reconsideration in the Rule 29 and Rule 33 context in general.  The *Gupta* approach may be harsh: requiring a defendant to file a motion for reconsideration within the seven-day period—or during an extended period of time granted by the court—may effectively preclude the availability of such motions altogether, as it is unlikely that a court will even be able to rule on the initial motion within the time period.  In the Second and Sixth Circuits, in contrast, the defendant will not lose the opportunity to move for reconsideration if the ruling is issued outside the time period; to preserve the interests of efficiency and judicial economy, however, the defendant must so move within a reasonable time (ten days) of that ruling.  The approach suggested by the Tenth Circuit in *Miller* and the Fifth Circuit in *Cook* (but not in *Ramirez*) serves those interests less effectively, as it would allow a defendant to move for reconsideration up to the moment the district court is divested of jurisdiction by expiration of the ten-day period, following entry of final judgment, that is allotted for filing a notice of appeal under Federal Rule of Appellate Procedure 4(b)(1)(A).  That approach would condone a defendant's moving for reconsideration long after the actual ruling—in this case, nearly a year.  Such permissiveness, as noted by the court in *Gupta*, seems contrary to the policies reflected by the strict time limits of Rules 29 and 33.

In light of the above case law, the court is therefore skeptical that any motion for reconsideration of the denial of a Rule 29 or 33 motion, filed eleven months after that denial, can be considered timely.  In the absence of more explicit guidance from the Seventh Circuit, however, the court is reluctant to simply follow *Gupta* and dismiss the February 26 motion in its entirely as untimely on the ground that it was not filed by August 29, 2005.  Nor will the court adopt the Second and Sixth Circuits' approach—although the court finds that approach quite persuasive—and dismiss the motion as untimely for not having been filed within ten days of the court's March 27, 2006 denial

of Defendant's Rule 29 and 33 motions. Even assuming the motion for reconsideration itself is timely, however, the court lacks the authority to entertain any argument in this motion that was not included in Defendant's prior timely post-trial filings, *see Holt*, 170 F.3d at 703; and, as discussed below, Defendant's new arguments for reconsideration of arguments that were in fact raised in previous motions, are without merit. The court addresses Defendant's eleven arguments in turn.

## II.     Defendant's Arguments for a New Trial

### A.     Denial of Requests for Continuance

Defendant contends that the court's denial of his third request for a continuance on June 30, 2005, and of Mr. Kamin's request for a 60-day continuance when he moved to substitute as counsel, had a "devastating impact" on Defendant's right to a fair trial. (Mot., at 33-34.) As the government correctly points out, this is an entirely new argument, one that was not presented in any previous post-trial motion. (Resp., at 12.) Accordingly, it must be dismissed as untimely. *See Holt*, 170 F.3d at 703.

Defendant maintains, however, that his claim in the August 5 *pro se* motion that the court had "forced [Ms. Evans] to be ineffective or to commit Sixth Amendment violations," (August 5 motion ¶ 2), "can be fairly read" to raise an argument that the court erred in denying Ms. Evans' request for a continuance. (Reply, at 12.) The court disagrees. Defendant argued in the August 5 motion that the court caused Ms. Evans' ineffectiveness by "requiring her alone to follow the rules." (August 5 motion ¶ 2.) Such an argument, even under the most liberal construction, cannot be deemed to have raised a point of error with respect to the court's denial of Ms. Evans' June 30 request for a continuance; and nothing in the August 5 motion even remotely refers to Mr. Kamin.

Moreover, the present argument is without merit. A district court exercises "broad discretion" with respect to the granting of continuances, and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983); *United States v. Jones*, 455

F.3d 800, 806 (7th Cir. 2006).  As explained in the July 1 Order, the court had, by the time of the June 30 request, granted two of Ms. Evans' requests for a continuance, moving the trial date from February 2005 to the end of June.  July 1 Order, at 9.  The court had also appointed Mr. Camarena, who had been working on the case since May 11.  The court further noted that

> [t]here is little doubt that [Defendant] himself has created all of the problems with his attorneys by refusing to cooperate with them and by making threatening remarks against them in open court. . . . A grant of his motion for continuance . . . is unlikely to resolve these issues as long as [Defendant] is determined to do everything within his power to delay his trial.

*Id.* at 4.  The February 26 motion nowhere confronts this reasoning, nor does it attempt to show how the court's decision was unreasoning or arbitrary.  Furthermore, having denied Mr. Kamin's request to file an appearance, the court properly disregarded his request for a continuance.

### B.    Appointment of Counsel Who Had Been "Fired"

In the first of several attacks on the court's appointment of Mr. Brewer, Defendant argues that the court erred in appointing counsel who "previously had been fired," without further inquiring as to why Mr. Brewer had been "fired."  (Mot., at 35-40.)  In the August 5 motion, Defendant did argue that the court erred in reappointing Mr. Brewer "who had previously been forced off the case by [Defendant]," but explained that that had occurred because Mr. Brewer had "attempted to extort money" from Defendant.  (August 5 motion ¶ 3.)  The only aspect of the present argument that can be construed as having been raised in the August 5 motion is the notion that the court appointed counsel who had "been fired"; any remaining argument is new and thus untimely.

As noted, however, the record contains no evidence indicating that Defendant actually "fired" Mr. Brewer in January 2005; rather, Mr. Brewer voluntarily withdrew from the case following Defendant's refusal to meet with him at the MCC.  *See* July 22 Order, at 7 ("Mr. Brewer withdrew from the case early on, not, as [Defendant] claims, at [Defendant's] request").  The February 26 motion points to Defendant's asking the court on July 21, 2005, "You do know that I fired [Mr. Brewer] back in January and that he withdrew from the case, don't you?"  Tr. at 2033.  When told

that it was the court's understanding that Mr. Brewer had withdrawn, Defendant did not deny this, but asserted that Mr. Brewer had done so "Because of a conflict of interest. He had *ex parte* communications with the U.S. Attorney and the other agents, and I got wind of it" and asked Mr. Brewer to withdraw. Tr. at 2034. The court declined to credit this assertion at the time, and does not do so now. Defendant has provided the court with no new evidence, nor any persuasive reason to question its conclusion that Mr. Brewer had voluntarily withdrawn and that no further inquiry was necessary into the circumstances of that withdrawal.

Moreover, even if Defendant had asked Mr. Brewer to withdraw in January 2005, Defendant fails to explain why this fact alone should have precluded the court's reappointment of Mr. Brewer six months later. Defendant maintains that he "lost confidence" in Mr. Brewer's representation in January 2005, and that "no evidence was presented to the court to indicate that . . . Mr. Brewer had regained" that confidence. (Mot., at 35.) Throughout this case, however, Defendant has voiced objections to and displeasure with all his attorneys, and attempted to fire Ms. Evans and Mr. Camarena on more than one occasion. Defendant's unwillingness or refusal to work with any of his attorneys does not satisfy the court that he is entitled to a new trial.

### C. Mr. Brewer's Opinions "At Odds" With Defendant's Interest

The February 26 motion contends that Mr. Brewer "characterized his client's views, state of mind, and strategy in ways that were clearly at odds with [Defendant's] interest in effective and conflict-free representation." (Mot., at 40.) Defendant points to only one example of Mr. Brewer's alleged ineffectiveness, however: Mr. Brewer's representation to the court, during the meeting in chambers on July 8, that there had been "no real conflict" between him and Defendant at the time Mr. Brewer had withdrawn from the case.[13] (*Id.*) The government correctly points out that this is

---

[13]     Defendant also asserts that Mr. Brewer adopted the government's position, and "opined" to the court that Defendant had "rejected" Mr. Brewer's advocacy merely to delay the case. (Mot., at 40-41.) Defendant's citation to the record reveals no such representation on the part of
(continued...)

an entirely new argument and is thus untimely. (Resp., at 5.) Moreover, the argument has no merit, as Defendant fails to present any evidence to indicate that Mr. Brewer's statement to the court was false, or to explain how that statement violated Defendant's constitutional rights.

### D.    Allowing Mr. Brewer to Enter the Case on Short Notice

Defendant also contends that the court left Mr. Brewer insufficient time to investigate the defense and to adequately prepare for trial. (Mot., at 42-44.) The August 5 motion raised a different version of this claim: that the court erred in allowing Mr. Brewer "to falsely claim he would be adequately prepared" for trial. (August 5 motion ¶ 5.) Although the government characterizes these as two separate arguments, (Resp., at 5), the court does not find the arguments so different as to necessarily require that the new argument be dismissed as untimely.

The argument is unpersuasive, however. As the court explained on March 27, 2006 in denying Defendant's Rule 29 and 33 motions, any claim of ineffectiveness based on Mr. Brewer's allegedly inadequate preparation requires a showing of prejudice, as demonstrated by a threshold identification of some act or omission on the part of Mr. Brewer that adversely affected Defendant's right to a fair trial. Order of 3/27/06; *see Strickland v. Washington*, 466 U.S. 668, 690 (1984) (defendant raising claim of ineffective assistance of counsel must first "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment"); *Badelle v. Correll*, 452 F.3d 648, 662-63 (7th Cir. 2006) (ineffectiveness claim based on inadequate investigation of defense failed because defendant described no particular pretrial investigative errors or omissions); *United States v. Farr*, 297 F.3d 651, 657 (7th Cir. 2002) ("the defendant must direct [the court] to the specific acts or omissions that allegedly form the basis of his [ineffectiveness] claim"). The court denied the motions because Defendant had identified no step that counsel should have taken, no question Mr. Brewer failed to ask, and no evidence that he

---

[13](...continued)
Mr. Brewer. Tr. at 898, 905.

should have presented but did not. The February 26 motion similarly identifies no concrete example of Mr. Brewer's alleged ineffectiveness. Rather, citing the Eleventh Circuit's opinion in *United States v. Verderame*, 51 F.3d 249 (1995), Defendant maintains that the fact that Mr. Brewer stepped back into the case on July 8, 2005, with opening arguments scheduled for July 12, is sufficient, in and of itself, to demonstrate constitutional error. (Mot., at 42-44.)

*Verderame* is readily distinguishable, however. There, the court concluded that a 34-day interval between arraignment and trial failed to provide defense counsel with sufficient time to prepare, where the defendant had initially been charged with conspiracy to distribute both marijuana and cocaine, and served a bill of particulars indicating property subject to forfeiture; but the case had grown during that period to encompass further property subject to forfeiture, and the government, four days before trial, dropped the cocaine charge to focus on the marijuana charge. 51 F.3d at 252. Noting that "[i]mplicit in [the] right to counsel is the notion of adequate time for counsel to prepare the defense[,]" the court held that the district court had erred in denying the defendant's four unopposed requests for a continuance. *Id.* No such circumstances are present here. Nearly a year had passed between Defendant's arraignment and the start of trial; Mr. Brewer had already represented Defendant for several months of that time; Mr. Camarena had been working on the case for nearly two months when Mr. Brewer stepped back in; the court had in fact already granted two of Defendant's requests for a continuance, over the government's objections; and the nature of the government's case had not changed from the date of the arraignment.

It is not until Defendant's reply to the government's response to the February 26 motion that Defendant finally attempts to identify specific examples where, he maintains, Mr. Brewer's lack of preparation resulted in prejudice. That reply brief—filed on April 10, 2007, more than a year after the court's decision denying Defendant's post-trial motions—points to "several major areas" demonstrating Mr. Brewer's ineffectiveness: (1) a negative impact on Mr. Camarena's ability to provide effective representation, because Mr. Camarena was unfamiliar with the evidence and had

been relying on Ms. Evans to identify the "important parts"; (2) Mr. Brewer's failure to object to, and mistaken eliciting of, testimony regarding gang activity and cocaine, which, according to Defendant, the court had barred pre-trial; (3) and Defendant's refusal to be cross-examined and consequent striking of his testimony, which Defendant urges was the result of Mr. Brewer's failure to prepare Defendant for testimony. (Reply, at 28-35.)

Aside from the untimeliness inherent in Defendant's failure to raise these arguments until his reply brief to the government's response to his fourth post-trial motion,[14] Defendant's identification of the above three "major areas," purportedly demonstrating Mr. Brewer's ineffectiveness due to his lack of preparation, does not persuade the court to revisit its denial of Defendant's Rule 29 and 33 motions. The first such "area"—an alleged negative impact on Mr. Camarena's performance—lacks any specific examples, and thus fails for the same reasons of vagueness that have plagued Defendant's prior attempts at showing ineffectiveness; moreover, the court is aware of no evidence to suggest that Mr. Camarena was in fact unfamiliar with any of the evidence presented at trial. Defendant does get into specifics with his allegations that Mr. Brewer's unfamiliarity with the court's pre-trial rulings resulted in his failure to object to, or his eliciting of, testimony concerning gangs and cocaine. This argument reflects a misunderstanding of the court's rulings, however: contrary to Defendant's assertion, the court did not "prohibit[] evidence of gang affiliation from entering the government's case in chief." (Reply, at 28.) Rather, the court ruled that evidence of Defendant's and co-defendant Mannie's gang membership and rank was indeed admissible in support of the government's theory that Defendant's rank enabled him to insulate

---

[14]     Defendant provides no explanation as to why these arguments were not raised either in (1) his timely August 2005 post-trial motions; (2) the December 2005 "amended" post-trial motion; (3) the March 2006 hearing on those post-trial motions, where the court explicitly asked for specific examples of ineffectiveness; or (4) the February 26 motion itself. Defendant points to no new evidence justifying the delay, and cites only to trial transcripts that have long been available. Moreover, despite styling the instant motion as a request for "reconsideration," Defendant fails to identify any way in which the court's prior rulings were incorrect.

himself by directing that guns be delivered to Mannie rather than to himself.  Memorandum Opinion and Order of June 9, 2005, at 5-6.  Moreover, although Defendant asserts that Mr. Brewer's cross-examination of one of the government's witnesses, Officer Bocardo, "put more gang information in front of the jury," (Reply, at 31), it appears that Mr. Brewer was attempting to demonstrate that Bocardo had no concrete evidence of Defendant's alleged gang membership.  Tr. at 1166-67 (asking if Bocardo had gang intelligence reports on Defendant, and when Bocardo replied "I could get you documents," stating "I would certainly like to see those"); Tr. at 1187-88 (eliciting testimony that Bocardo had not observed Defendant meeting with gang members).  Rather than demonstrating Mr. Brewer's purported lack of familiarity with pre-trial rulings, the exchange reflects an effort to blunt the impact of evidence that the court had in fact ruled admissible.  Finally, Mr. Brewer did, shortly thereafter, object to the government's efforts to introduce further gang-related evidence, Tr. at 1218, and in response, the court directed the government to notify the court before attempting any such further efforts.  Tr. at 1226.

With respect to cocaine, the court did rule that it was "inclined to sustain" any objection by Defendant to evidence of cocaine purchases, but did not, contrary to Defendant's assertion, categorically bar any such reference.  Memorandum Opinion and Order of June 9, 2006, at 10. Defendant now asserts that by eliciting testimony during cross-examination of the government's cooperating informant regarding Defendant's alleged attempts to purchase cocaine, Tr. at 2187-90, 2194, Mr. Brewer demonstrated his "ignorance" of pre-trial discussions of the issue.  (Reply, at 33.) Defendant fails to point to any evidence that Mr. Brewer was in fact unaware of the court's rulings on the issue, however; nor does he explain why Mr. Brewer's eliciting of such testimony was not simply a trial strategy intended to attack the credibility of the government's star witness.  *See* Tr. at 2189 (eliciting testimony from the informant that he had made contradictory statements with respect to whether Defendant had purchased cocaine from him).  Moreover, Defendant fails to explain how any reference to cocaine actually prejudiced him.

With respect to the third "area" of ineffectiveness, Defendant presents no evidence that his refusal to submit to cross-examination was caused by Mr. Brewer's appointment shortly before trial. As noted, Defendant refused, from the beginning, to cooperate with many aspects of the proceedings. The notion that his refusal to answer questions on cross-examination was somehow the fault of Mr. Brewer, due to a lack of preparation prior to trial, is unworthy of further discussion. Moreover, on the day of Defendant's direct examination, Mr. Brewer did meet with and prepare Defendant for his direct examination at some length, during a lengthy recess to which the government objected. Tr. at 2923-50.

Finally, Defendant's contention that Mr. Brewer was ineffective for failing to investigate the defense fails as well. (Mot., at 42-43.) Again, Defendant fails to identify precisely what Mr. Brewer should have investigated but did not; Defendant simply asserts that Mr. Brewer was "forced" to "proceed to trial without investigating the case, consulting with his client or with previous counsel, and without adequate time to review all of the case material to make the most basic determination about the need for any additional investigation of the case." (Mot., at 44.) Absent any explanation of how Mr. Brewer failed to investigate the defense, Defendant argues only that given the short time frame, Mr. Brewer must not have done so. This argument is unpersuasive.

Defendant's citations to *Williams v. Taylor*, 529 U.S. 362 (2000) and *Adams v. Bertrand*, 453 F.3d 428 (7th Cir. 2006) are unavailing. In *Williams*, the Supreme Court held that a habeas petitioner had established an ineffectiveness claim where counsel had not begun to prepare for the sentencing phase of the trial until a week before trial. 529 U.S. at 395. The Court noted a long list of evidence that an adequate investigation would have uncovered: the defendant's "nightmarish childhood," including his parents' imprisonment for criminal neglect, severe and repeated beatings administered by his father, and a stint in an abusive foster home; the fact that he was "borderline mentally retarded"; and his exemplary behavior in prison that included his cooperation in helping to crack a prison drug ring. *Id.* at 395-96. Here, Defendant's failure to produce any similar

evidence of what Mr. Brewer might have uncovered, renders *Williams* inapposite. Similarly, in *Adams*, the Seventh Circuit held that counsel should have investigated, located, and called a particular witness who could have provided testimony potentially exonerating the defendant. 453 F.3d at 436-37. Defendant identifies no such witness here.

In its July 22 Order, the court explained that it had reappointed Mr. Brewer because he was familiar with the case, had substantial criminal law and trial experience, and had had a long relationship with Defendant. July 22 Order, at 2. Having at that point presided over much of the trial, the court found Mr. Brewer well-prepared, capable, and effective; moreover, he was assisted by Mr. Camarena, who had been working on the case for over two months, and whom the court found thoroughly prepared and exceedingly capable as well. *Id.* at 7. The February 22 motion fails to persuade the court to revisit its conclusion that both attorneys provided Defendant with thorough and effective representation.

### E. Conflict of Interest

In his final attack on the court's appointment of Mr. Brewer, Defendant contends that Mr. Brewer's participation in the State's Attorney's investigation into allegations of torture by Jon Burge and other Chicago Police officials presented a conflict of interest. (Mot., at 44-45.) According to Defendant, the Burge report has been "criticized for being too little, too late, for taking too long to prepare, and for failing to recommend that any action be taken to compensate the victims of torture or to punish the perpetrators." (*Id.* at 45.) Defendant maintains that Mr. Brewer's (unidentified) role in the investigation amounts to a "potential conflict of interest" that should have been disclosed to the court.[15] (*Id.*)

---

[15] The February 26 motion does not contend that Mr. Brewer failed to disclose his role in the Burge investigation to Defendant. In his letter to the court, Mr. Brewer states that he and Defendant discussed Mr. Brewer's work with the investigation "on numerous occasions," and that at campaign events during Mr. Brewer's 2003 campaign for State's Attorney, Defendant would introduce him and cite the fact that he had worked on the investigation. (Letter from Brewer to the
(continued...)

Because this argument was never raised in any previous post-trial motion, it is untimely and must be denied on that basis alone. *See Holt, supra.* In any event, this argument, too, is without merit. To show a Sixth Amendment violation, Defendant must establish that Mr. Brewer's participation in the Burge investigation constituted an "actual conflict of interest" that "adversely affected [Mr. Brewer's] performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "An actual conflict of interest exists when 'the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests.'" *United States v. Pergler*, 233 F.3d 1005, 1009 (7th Cir. 2000) (quoting *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988) (citations omitted)). To the extent Defendant urges a "potential" conflict of interest that was not brought to the court's attention, he must prove that Mr. Brewer "actively represented conflicting interests and that it prejudiced [Defendant's] case." *Id.* at 1010. Defendant fails to explain how Mr. Brewer's participation in the Burge investigation demonstrates that Mr. Brewer's interests conflicted with his own. Indeed, Mr. Brewer's participation in an investigation into allegations of police brutality and torture—allegations made by Defendant, among others, even if Mr. Brewer did not personally investigate Defendant's allegations—tends to show that his and Defendant's interests were aligned. And finally, Defendant's suggestion that the court would not have appointed Mr. Brewer if it had known of his participation is speculative and incorrect; if anything, such evidence would have provided yet another reason for the court to conclude that Mr. Brewer's long relationship with Defendant placed him in a unique position to represent Defendant's interests effectively at trial.

Defendant's argument that the court erred by not inquiring into Mr. Brewer's alleged conflict of interest fails for the same reason: the court had no reason to believe that any conflict existed. *See Cuyler*, 446 U.S. at 347 ("Unless the trial court knows or reasonably should know that a

---

<sup>15</sup>(...continued)
court of March 14, 2007, Ex. B to Resp.) Defendant's reply does not deny that he was aware of Mr. Brewer's work, but rather insists that "the question is not whether [Defendant] knew, but whether this was disclosed to the court." (Reply, at 36.)

particular conflict exists, the court need not initiate an inquiry.").

### F.     Denial of Leave for Mr. Kamin to File an Appearance

Defendant next contends that in denying Mr. Kamin leave to file an appearance on July 7, 2005, the court violated his right to counsel of choice under the Supreme Court's June 2006 decision in *Gonzalez-Lopez.* (Mot., at 46-50.)  The government objects that this argument, having not been presented previously, is time-barred; and that the argument lacks merit in any event. (Resp., at 8.)  Although the court is less certain that this argument, which relies on recent authority, is indeed untimely, the court agrees that Defendant's rights were not violated by the court's denial of Mr. Kamin's motion.

It is unclear whether intervening case law may constitute an exception to the rule that a district court lacks authority to entertain an argument that was not previously raised in a timely Rule 29 or 33 motion.  *See Holt*, *supra.*  Defendant contends that to the extent an argument is based on "new law," it falls within the statutory three-year time limit for a Rule 33 motion grounded on "newly discovered evidence."  *See* FED. R. CRIM. P. 33(b)(1).  Defendant cites to no authority holding that a court decision falls within the "newly discovered evidence" rubric, however, and at least one court in this district has concluded that intervening case law does not give a district court adjudicatory power to entertain an untimely Rule 33 motion.  *United States v. Getty*, No. 97 CR 835, 1999 WL 1024518, at *1 (N.D. Ill. Nov. 5,1999) (rejecting as untimely defendant's argument, raised in a post-trial motion filed after the Rule 33 deadline expired, that an intervening Supreme Court decision rendered the court's jury instructions faulty).

The court need not decide the issue, however, because the government is correct that *Gonzalez-Lopez* does not require that Defendant receive a new trial.  The defendant in *Gonzalez-Lopez*, charged in federal court in Missouri with conspiracy to distribute marijuana, hired a California attorney, Low; the court allowed Low a provisional entry of appearance, which it then revoked upon concluding that Low had violated a local court rule.  126 S. Ct. at 2560.  The court

then denied Low's several applications for admission *pro hac vice*. *Id.* The Eighth Circuit vacated defendant's subsequent conviction, concluding that the district court had violated his right to paid counsel of his choosing. *Id.* at 2561. That issue was not before the Supreme Court, however, as the government did not dispute that the district court had erroneously deprived defendant of his choice of counsel; rather, the Court was asked to determine whether violation of the right to counsel of choice requires an additional showing of prejudice. *Id.* at 2561-62. The Court held that no such showing was necessary, and that violation of the right to counsel of choice constitutes a "structural defect" and therefore is not subject to harmless error analysis. *Id.* at 2563-65.

*Gonzalez-Lopez* thus does not address the question of what constitutes an erroneous deprivation of the right to paid counsel of choice in the first place; rather, it addresses only the consequences of a violation. Indeed, although the Court's holding emphasizes the significance of a deprivation of the right to counsel of choice, the Court noted at the outset that that right "'is circumscribed in several important respects.'" *Id.* at 2561 (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)). The Court further recognized a trial court's "wide latitude in balancing the right to counsel of choice against the needs of fairness," *id.* at 2565-66 (citing *Wheat*, 486 U.S. at 163-64), "and against the demands of its calendar," *id.* at 2566 (citing *Morris*, 461 U.S. at 11-12). Similarly, the Seventh Circuit has explained that the right to counsel of choice "'is not absolute, but qualified, and must be balanced against the requirements of the fair and proper administration of justice.'" *United States v. Micke*, 859 F.2d 473, 480 (7th Cir. 1988) (quoting *United States v. Rasmussen*, 881 F.2d 395, 401 (7th Cir. 1989)). The "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *United States v. Moya-Gomez*, 860 F.2d 706, 724 (7th Cir. 1988) (internal quotation marks and citation omitted). Defendant fails to identify any way in which *Gonzalez-Lopez* disturbed this precedent, and in the court's view, it did not.

31

Because *Gonzalez-Lopez* represents no relevant change in the well-settled parameters of the right to counsel of one's choice, the court is not persuaded to revisit its denial of Mr. Kamin's request to substitute as counsel. That request came after jury selection in this case had begun, and was accompanied by yet another of a series of requests for continuances. As explained in the July 1 and July 22 Orders, it was evident to the court that Defendant's incessant quest for more time and for different counsel was part and parcel of a deliberate strategy to "do everything within his power to delay his trial." July 1 Order, at 4; July 22 Order, at 7; *see United States ex rel. Kleba v. McGinnis*, 796 F.2d 947, 952 (7th Cir. 1986) ("[T]he Sixth Amendment does not give an accused the power to manipulate his choice of counsel to delay the orderly progress of his case.") (internal quotation marks and citation omitted).

Finally, as noted, the record contains no competent evidence to support the assertion that Defendant actually retained Mr. Kamin in July 2005. Mr. Kamin represented at the time only that Defendant, through "someone at the MCC," had "indicated his interest" in retaining Mr. Kamin. Defendant's new assertion that he had in fact "hired" Mr. Kamin, raised for the first time in the February 26 motion, is supported only by Mr. Kamin's statement in his affidavit that he and Defendant had signed a contract; but the copy of that purported contract attached to the affidavit is unsigned, undated, and incomplete, and is thus insufficient to support that assertion.

### G.    Denial of Defendant's Requests to Proceed *Pro Se*

Defendant contends that the court's denial of his requests to proceed *pro se* or as "co-counsel" were in error, and further argues that the court should have conducted a colloquy with Defendant to determine whether he was competent to represent himself. (Mot., at 51-54.) The latter argument is raised for the first time in the February 26 motion and is thus time-barred. *See Holt*, *supra*. Defendant did argue in the August 5 *pro se* motion that he should have been allowed to represent himself; Defendant does not, however, advance any argument here to persuade the court that its decisions to deny his *pro se* requests were incorrect.

Defendant devotes most of his argument to emphasizing the importance of the right of self-representation, with which the court does not disagree. *See generally Faretta v. California*, 422 U.S. 806 (1975) (recognizing that a criminal defendant has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so, and that the state may not force an attorney upon him when he insists that he wants to conduct his own defense). Defendant fails to adequately confront the court's reasoning for denying his requests to proceed *pro se*, however. In the July 1 Order, the court explained that through his disruptive behavior—which included inappropriate speeches to the court and the government's attorneys, failure to abide by the court's guidelines, encouraging his supporters in the courtroom to protest at the private residences of his attorneys, and violent physical outbursts—Defendant had forfeited his right to self-representation. July 1 Order, at 8. A court is entitled to "'terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.'" *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (quoting *Faretta*, 422 U.S. at 835 n.46). In denying Defendant's motions to proceed *pro se* or as "co-counsel," the court noted his "persistent refusal to obey even the most basic standards of courtroom decency," the need to protect jurors from threats similar to those he had made against his attorneys, and the danger of prejudice to co-defendant Mannie. July 1 Order, at 8. The court further found that Defendant had "shown no indication that he [would] be willing to comport himself with decency and respect befitting this courtroom during the trial." *Id.*; *see Brock*, 159 F.3d at 1080-81 (affirming district court's denial of defendant's request to proceed *pro se* where, during pretrial proceedings, defendant expressed dissatisfaction with the court's rulings by refusing to answer questions or to cooperate in any way with the proceedings, and by storming out of the courtroom; in light of defendant's "obstructionist" pretrial conduct, it was "reasonable for the trial court to conclude that . . . he would continue to be disruptive at trial").

Defendant does not now deny having engaged in disruptive and obstructionist conduct. Instead, he maintains that the court "did not take into account" the times where he "comported

himself well"; his (unidentified) promises, made through counsel, that he would not disrupt proceedings if allowed to proceed *pro se*; his alleged post-traumatic stress disorder; and "the reason for his rage," which, according to Defendant, was that his attorneys were unprepared. (Reply, at 11-12.) None of these factors, which largely amount to mere excuses or attempts to justify Defendant's inappropriate courtroom behavior, persuades the court that it should have allowed Defendant to proceed *pro se*.

### H. Inability to Present Theories of Defense

Defendant next argues that the court violated his right to present a defense in two ways: first, the court's "forcing unwanted counsel" on him left him unprepared for cross-examination, which in turn led to his refusal to submit to cross-examination, the court's striking of his direct testimony, and his consequent inability to present theories of entrapment, government misconduct, and lack of specific intent, (Mot., at 57-62); and second, that the court erred in barring evidence of entrapment or selective prosecution prior to his testimony. (*Id.* at 64-66.) Defendant raised no arguments relating to his ability to present theories of defense in his timely August 5 or 29 post-trial motions, however; these arguments are presented for the first time here and are untimely.

Moreover, as discussed above, Defendant fails to present any evidence that his refusal to submit to cross-examination was due to any fault on the part of trial counsel, or indeed was the result of any external factor apart from than his own intransigence. In any event, Defendant has yet to identify any evidence that would support his claims of entrapment and government misconduct. Nor has he suggested what evidence would rebut the government's ample showing of specific intent.

### I. Juror Bias

Defendant further contends that a new trial is required due to juror bias and racial prejudice. According to the February 26 motion, "the jury was infected by fear based on little more than the blackness of the people in the audience and the perception that some of the people in the audience

were 'staring' at the jurors." (Mot., at 79.) In support of this argument, Defendant cites to selected portions of a number of jurors' *in camera* responses to the court's questioning, following Juror 85's expressions of concerns over spectators who were "black" and "male" and appeared to her to belong to a gang, Tr. at 2043, and Juror 119's hearsay comment referring to "unsavory people" in the gallery. Tr. at 1661. Defendant argues that the court's questioning was "perfunctory and unhelpful," (Mot., at 71), and therefore insufficient to ascertain the true extent of potential bias. (*Id.* at 75.) The government maintains that this argument is untimely and without merit.

The government concedes that the August 5 *pro se* motion did generally raise the issue of juror bias: Defendant there argued that the court "erred in not granting the motion for mistrial or at least removing the juror who made the comment about 'unsavory characters' in the gallery"—presumably, Juror 119—which "show[ed] prejudice or bias at the least." (August 5 motion ¶ 6.) The government points out, however, that the February 26 motion supports Defendant's allegations of juror bias by highlighting statements by different jurors, and by challenging the court's questioning of jurors in response to Juror 85's comments. (Resp., at 11.) Defendant responds that the fact that the August 5 motion raised the issue of juror bias at all is sufficient to render the new arguments timely. (Reply, at 15.) Again, however, Defendant nowhere explains why these arguments are raised for the first time nearly nineteen months after the verdict. Defendant cites to no new evidence, but bases the current arguments on portions of trial transcripts that have long been available. Although the court is therefore inclined to agree with the government that the arguments relating to juror bias in the February 26 motion are new and thus untimely, the court finds Defendant's allegations of racial prejudice unfounded in any event.

Defendant highlights and extensively discusses Juror 85's comments, which he maintains reveal racial prejudice and an unfounded and speculative fear of gangs. (Mot., at 72-75.) The court removed Juror 85, however, upon finding unsatisfactory her answers to questions concerning her ability to remain impartial and to fairly consider the evidence. In response to Juror 85's remarks,

the court and the attorneys questioned each juror individually in chambers. The court first asked each juror whether "there was anything going on the courtroom" that would make it difficult for the juror to be fair, or that was "distracting"; the court then specifically asked about spectators in the gallery, and whether any of those individuals had been "threatening" or "intimidating" or "disturbing." Most of the jurors replied that they had not even noticed the people coming and going in the courtroom, or that the spectators had not bothered or distracted them. One juror did report that some other jurors had noticed spectators possibly exchanging signs with Defendant; another mentioned "weird looks" from spectators; a third mentioned two men in sunglasses that had "kind of like freaked me out a little bit"; and a fourth reported "discomforting . . . facial reactions" and what the juror thought might be gang signs from spectators. Significantly, only one juror even mentioned race: Juror 120 reported that a "bald, black" man in the galley had made her "a little bit nervous." Defendant's attorneys asked follow-up questions of some jurors, and the court concluded each interview by asking the juror whether anything they had observed would affect their ability to be fair to the defendants, or to fairly consider the evidence. All replied negatively, and save for Juror 85, Defendant's attorneys expressed no concerns of racial prejudice with respect to any juror, and did not move to excuse any juror.

Defendant characterizes the court's questions as "so vague as to be meaningless," (Mot., at 75), and urges that the court should have asked more explicit questions to determine if the unease expressed by a few of the jurors was grounded in racial prejudice. (*Id.* at 75-79.) It has been the court's experience, however, that most people do not readily admit to bigotry when directly asked if they are prejudiced. It is for that reason that the court asked open-ended questions, designed to elicit as much information as possible while avoiding making the jurors feel uncomfortable or defensive.

Defendant relies on *United States v. Heller*, 785 F.2d 1524 (11th Cir. 1986), in which the Eleventh Circuit held that the district court should have granted a mistrial upon learning of jurors'

explicit racial and ethnic slurs during deliberations and conversations with each other, and that the trial judge's individual questioning of the jurors, which consisted largely of asking the jurors whether they could reach a decision without bias or prejudice, was insufficient. *Id.* at 1527-28. The court noted that racism and anti-Semitism remain "ugly malignancies" in American society, that courts "must remain vigilant" in ensuring "equality and fairness," and that "[a] racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires." *Id.* at 1527.

This court disagrees with none of the above sentiments. The jurors in this case, however, exhibited nothing like the prejudice reflected by the jurors' comments in *Heller*, which included remarks such as "the fellow we are trying is a Jew. . . . 'Let's hang him'"; references to "rich Jews" and to "how many Kaplans" would be in the courtroom; one juror's story about a "nigger"; and numerous other racial, religious, and ethnic slurs. *Id.* at 1526. Defendant points to no similar evidence of racial prejudice here, and the court is aware of none.

Nor is the court persuaded that its questioning was insufficient to ascertain the extent of any bias. The Seventh Circuit has explained that a district court has wide discretion in determining the seriousness of any potential juror bias, the credibility of sources of allegations of bias, and whether the bias requires a mistrial. *See United States v. McClinton*, 135 F.3d 1178, 1186 (7th Cir. 1998) (affirming denial of motion for mistrial on grounds of juror bias, where the district court questioned jurors individually regarding the meaning of one juror's potentially racist comment, evaluated the jurors' demeanor and credibility, and dismissed the juror who made the offending comment but was satisfied that none of the remaining jurors were tainted); *see also United States v. Williams*, 737 F.2d 594, 612 (7th Cir. 1984) (deferring to district court's credibility evaluations when deciding whether jurors could disregard improper *ex parte* contact). The court here is satisfied that the jurors remaining after the removal of Juror 85 harbored no racial prejudice that affected their ability to be

fair, and that the court's questioning, along with that of counsel for both Defendant and the government, was sufficient to ascertain the scope of any potential bias.[16]

### J.    Evidence of Gang Affiliation

Defendant next contends that the court erred in allowing the government to present certain testimony pertaining to a relationship of gang hierarchy between Defendant and co-Defendant Mannie. (Mot., at 81.) As Defendant concedes, the government unsuccessfully sought to introduce much more gang-related evidence, principally through the testimony of former ATF Special Agent Young; the court, sustaining the bulk of Defendant's objections, limited that testimony to the meaning of certain handshakes, and to what Defendant meant by references in audiotapes to "We Apaches," "my land," or "the akbar." Tr. at 2447-76. Defendant contends that even these references were too much, and that "the sole purpose of the gang testimony was to inject fear and prejudice into the case." (Mot., at 81.)

The government is correct that Defendant presented no challenge to this or any other gang-related testimony in any previous post-trial motion, and that this argument must be dismissed as untimely. Furthermore, as discussed earlier, the court had concluded in a pre-trial ruling that a limited amount of such testimony would be appropriate for the purpose of establishing the relationship between Defendant and Mannie. As Defendant advances no argument as to why that conclusion was in error, the court declines to revisit it.

### K.    Cumulative Effect of Errors

As his final argument, Defendant contends, for the first time, that the "cumulative effect" of the court's alleged errors necessitates a new trial. (Mot., at 81-82.) As Defendant has never before presented this argument, it is untimely. Moreover, having failed to successfully establish any error on the basis of the above arguments, the argument necessarily fails. *Cf. United States v. Santos*,

---

[16]    The court is uncertain, in any event, that threatening behavior on the part of spectators would militate against an acquittal.

201 F.3d 953, 965 (7th Cir. 2000) (noting, where trial had contained "avalanche of errors," that "a court is required to assess the harm done by the errors considered in the aggregate.")

### L.    Alternative Argument for a Hearing

In replying to the government's response to the February 26 motion, Defendant identifies a number of "factual disputes" that, he claims, require a hearing. (Reply, at 4.) Defendant seeks further inquiry into Mr. Brewer's alleged "volunteer[ing] his services to the government" in seeking reappointment, his alleged conflict of interest due to his participation in the Burge investigation, the impact of post-traumatic stress disorder on Defendant's courtroom behavior, whether Defendant in fact hired Mr. Kamin in July 2005, whether any lawyer could have adequately prepared for trial with the time afforded Mr. Brewer, and "what was or was not done" by trial counsel to prepare for trial. (*Id.* at 5-7.) This belated request for a hearing, coming in a brief filed on April 10, 2007—more than twenty months after the verdict on July 29, 2005—is untimely. Furthermore, the court is not persuaded that Defendant has identified any genuine factual dispute that requires further inquiry. Indeed, as explained above, there is simply no competent evidence to support many of the factual assertions upon which Defendant bases his request, such as that Mr. Brewer "volunteered his services to the government" or that Defendant in fact hired Mr. Kamin in July 2005. Similarly, Defendant has failed to explain how Mr. Brewer's role in the Burge investigation created a conflict of interest, or to make any showing that Mr. Brewer was unprepared or ineffective. The court thus denies Defendant's request.

### CONCLUSION

For the reasons set forth above, Defendant's motion for reconsideration (423) is denied.

ENTER:

Dated:  May 14, 2007

_____
REBECCA R. PALLMEYER
United States District Judge